UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  10-60612-CIV-MARTINEZ-BROWN**

CHERYL PEARSON,

     Plaintiff,

vs.

WACHOVIA BANK, N.A.,

     Defendant.

_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant Wachovia Bank, N.A.'s Motion for

Summary Judgment **(D.E. No. 42)**.  Plaintiff Cheryl Pearson ("Plaintiff" or "Mrs. Pearson")

brought the above-captioned complaint in state court, asserting claims for Conversion (Count I)

and Civil Theft (Count II) and claims in the alternative for Unjust Enrichment (Count III) and

Imposition of a Constructive Trust (Count IV).  Defendant Wachovia Bank, N.A. ("Defendant"

or "Wachovia") removed the case to this Court and has moved for summary judgment.  For the

following reasons, Defendant's motion is granted.

### I.  Factual Background[1]

Kaye Pearson ("Mr. Pearson), Plaintiff's now-deceased husband, was an experienced

businessman who grew his primary company from 10 employees in 1980 to 100 employees in

2006.  Mr. Pearson owned or maintained an interest in a variety of businesses over the years.

Mr. Pearson was responsible for the Pearsons' personal investments.  Plaintiff did not

---

[1] Where not otherwise cited, the facts are derived from those assertions in the parties'
statements of material fact that the opposing party did not dispute.

review business documents presented by Mr. Pearson for her signature.  Plaintiff relied on her husband and her husband's advisors when executing documents such as a promissory note, unconditional guaranty or a ratification of an earlier unconditional guaranty.  With the exception of personal checking account statements, financial documents jointly addressed to Mr. and Mrs. Pearson that were delivered to the Pearsons' home were opened by Mr. Pearson.  Plaintiff only reviewed the monthly personal checking account statements she and Mr. Pearson received from Wachovia.

As of 2001, Mr. and Mrs. Pearson both maintained a personal bank account with Wachovia's predecessor, First Union.  In 2004, Plaintiff and Mr. Pearson guaranteed a Wachovia Bank commercial loan in the amount of $2,840,000 on behalf of Pearson Properties I, LLC.  In 2006, Plaintiff and Mr. Pearson executed a Ratification and Amendment of the 2004 Guaranty.

Plaintiff and Mr. Pearson entered into a contractual relationship with Wachovia's Wealth Management Group ("Wachovia Wealth") in October 2006.  Plaintiff did not read the 2006 Wachovia Investment Management Agreement before executing it.  Plaintiff was not involved in any discussions regarding the $7 million that the Pearsons invested with Wachovia Wealth. Plaintiff was not involved in discussions about whether to utilize both proprietary Wachovia accounts and outside advisors.  She was not present for any discussions between her husband and the Wachovia investment manager, nor was she ever involved in any discussions between her husband and the Wachovia relationship manager.  Plaintiff did not read any of the Wachovia Wealth trust statements until some time after her husband's death on March 21, 2009.

Mr. Pearson had an interest in an island resort in the Bahamas called Chub Cay.  In 2006, Mr. Pearson, on behalf of Chub Cay Club Associates Ltd., obtained a $4 million Standby Letter

of Credit ("SBLC") from Wachovia.  Mr. Pearson sought renewal of the SBLC in June 2008.

Mr. Pearson executed a July 13, 2006 Unconditional Guaranty ("2006 Guaranty") with Wachovia to guaranty the debts of Chub Cay Club Associates Ltd.  Mr. Pearson also executed a December 1, 2006 Promissory Note ("2006 Promissory Note") for $5.5 million dollars with Wachovia.

Plaintiff and Mr. Pearson executed a December 1, 2006 Security Agreement ("2006 Security Agreement") with Wachovia.  As with the wealth investment management agreement, Plaintiff did not read the 2006 Security Agreement prior to executing it.  Plaintiff did not know her husband's obligations at the time she signed the 2006 Security Agreement, and she did not ask him about those obligations.  Plaintiff did not ask Mr. Pearson or anyone at the bank or any outside advisors any questions prior to executing the 2006 Security Agreement.  Plaintiff did not seek advice of counsel prior to executing the 2006 Security Agreement.  Plaintiff did not request any changes to the 2006 Security Agreement.  At the time she executed the 2006 Security Agreement, however, Plaintiff was aware that her husband had invested in the Chub Cay project.

Mr. Pearson executed a January 31, 2008 Promissory Note ("2008 Promissory Note") for $6.5 million dollars with Wachovia.  Plaintiff and Mr. Pearson also executed a January 31, 2008 Security Agreement ("2008 Security Agreement") with Wachovia.  Plaintiff did not read it prior to executing it.  Plaintiff did not know her husband's obligations at the time she signed the 2008 Security Agreement.  As with the 2006 Security Agreement, however, she was aware that her husband had invested in the Chub Cay development and that there were outstanding loans in connection with Chub Cay.

The 2008 Security Agreement provided in part:

Debtor hereby grants to Bank a continuing security interest in and lien upon the following described property, whether now owned or hereafter acquired, and any additions, replacements, accessions, or substitutions thereof and all cash and non-cash proceeds and products thereof (collectively, "Collateral"):

All of the investment property, financial asserts, cash, equity interests, instruments, and/or general intangibles, which are held in or credited to an account (the 'Pledged Account') with Wachovia Bank, National Association, as Custodian, and the Pledged Account itself, described as followed: Account No. [XX]27, [XX]30, & [XX]49; and all rights to which the Debtor now or hereafter becomes entitled by reason of its interest in the previously described Collateral. . . .

The 2008 Security Agreement also provides that "No waiver, amendment, or modification of any provision of this Security Agreement shall be valid unless in writing and signed by Debtor and an officer of Bank."

As of the date she signed the 2008 Security Agreement as a debtor, Plaintiff had an interest in Wachovia Accounts XX27, XX30, and XX49. Additionally, Wachovia Accounts XX27, XX30, and XX49 were identified as collateral in both the 2006 and 2008 Security Agreement and further collateral was also defined as "all rights to which debtor now or hereafter becomes entitled by reason of its interest in any of the previously described collateral."

Stephen Cooney, a Wachovia banker who worked with Mr. Pearson, testified that some time after he asked Mr. Pearson his preference on how to issue account statements, the statements for the three pledged accounts, XX27, XX30, and XX49 were issued as one combined statement. Cooney Dep. 39-40. This combined statement had a different account number listed on the top of the statement, MXX07. Patricia Schnitzer, a loan adjustment manager for Wachovia, testified that the MXX07 number was a consolidation number, not an account number. Schnitzer Dep. 6.

On December 31, 2008, Scotia Bank drew on the SBLC for $4 million representing the personal guarantee of Mr. Pearson, among others. Schnitzer Dep. 54. According to the terms of the SBLC, that $4 million became due and payable immediately to Chub Cay and the guarantors. *Id*. However, Mr. Pearson defaulted under the unconditional guarantee when he failed to pay the SBLC amount on December 31, 2008. Schnitzer Dep. 45.

Plaintiff was aware some time after January 5, 2009 that Wachovia had paid Scotia Bank $4 million pursuant to the SBLC. On or about January 5, 2009, Wachovia notified Mr. Pearson and Plaintiff that Wachovia was making a demand for the amount that Wachovia had paid Scotia Bank. Schnitzer Dep. 60, 79.

In February 2009, prior to Mr. Pearson's death, Wachovia debited the $1,027,341.18 amount that Plaintiff complains of in this lawsuit from the Wachovia Wealth investment accounts.[2] Schnitzer testified that the information in the MXX07 February 2009 account statement indicate that the amount debited was the amount due and owing on the SBLC drawn on December 31, 2008. Schnitzer Dep. 72, 76. Schnitzer testified that the $1,027,341.18 was taken from the pledged accounts, and the MXX07 number was merely a consolidation number that permitted Wachovia to provide a single statement to the client for the three collateral accounts. Schnitzer Dep. 31-32, 34, 61.[3] Mr. Pearson died on March 21, 2009.

---

[2] The same month, Wachovia also debited $3,217,740.02 from Plaintiff and Mr. Pearson's Wachovia Wealth investment accounts pursuant to an amount due and owing on a line of credit that Mr. Pearson had. Plaintiff has not asserted a claim regarding that debit in this suit.

[3] Defendant asserts that the account statements show that the $1,027,341.18 was taken from the XX27 pledged account specifically. The notations on the account statements to which Defendant cites, however, do not make that fact completely clear, and Defendant has not pointed to any testimony clearly establishing that the debit came from the XX27 account rather than the XX30 and XX49 accounts. Instead the testimony establishes that the money came from one or

## II.  Standard

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  By its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Anderson*, 477 U.S. at 248;  *Matsushita Electric Indus. Co.,* 475 U.S. at 586.  It is "material" if it might affect the outcome of the case under the governing law. *Anderson*, 477 U.S. at 248.  In addition, in considering a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party.  *Id*. at 255.

If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment.  *See United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 2d 1428, 1438 (11th Cir. 1991).  The moving party  "'must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  "If the moving party makes such an

---

more of the pledged accounts, whether XX27, XX30, or XX49.  Schnitzer Dep. 31-32.

affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 3d at 1438 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc*., 931 F.3d 1472, 1477 (11th Cir. 1991)). *See also* Fed. R. Civ. P. 56(e).

        In contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim or affirmative defense. *Celotex*, 477 U.S. at 324. When the non-moving party bears the burden of proof, the moving party does not have to "support its motion with affidavits or other similar material *negating* the opponent's claim."  *Id*. at 323 (emphasis in original). The moving party may discharge its burden in this situation by showing the Court that "there is an absence of evidence to support the nonmoving party's case."  *Id*. at 324.  Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must "go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)). A non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### III.  Analysis

**A.      Account MXX07 and the Security Agreements**

        Plaintiff's theory of this case is that the three pledged accounts that served as collateral for

the SBLC—accounts XX27, XX30, and XX49—were consolidated into a new account, MXX07. Plaintiff argues that Wachovia debited this new account MXX07 when Mr. Pearson defaulted on the SBLC, and Plaintiff further asserts that because MXX07 was a new account, Wachovia did not have the right to treat it as collateral under the 2006 and 2008 Security Agreements. Accordingly, Plaintiff asserts that Wachovia is guilty of conversion and civil theft or, in the alternative, unjust enrichment that entitles Plaintiff to a constructive trust.

The Court, however, must consider the undisputed facts in analyzing Plaintiff's claims. The facts before this Court establish that the three pledged accounts were not consolidated into a new account. Rather, the MXX07 account number was only a number used by the bank in order to generate one account statement for all three accounts.[4] Because MXX07 was not an account, the money from the debit came out of one of the collateral pledged accounts, namely account XX27, XX30, or XX49. The Court notes that Plaintiff has not asserted that the Security Agreements were unenforceable or that Wachovia was not entitled to $1,027,341.18 from one of the original pledged accounts.

However, even if the Court were to consider the MXX07 account as a new account, it is

_____

[4] In an effort to dispute this fact, Plaintiff has pointed to evidence that after the accounts were first issued, Wachovia issued separate account statements for each of the three separate accounts, only later consolidating them into the one MXX07 account statement. This is not evidence that MXX07 was a new account; it merely shows that the statements were originally not issued in one combined statement. Similarly, evidence that Wachovia began issuing a separate statement for the pledged account XX27 after liquidated hedge fund assets began to be transferred into account XX27 does not show that MXX07 was a separate account or that the money from the pledged accounts was ever transferred into a new account. The undisputed testimony established that this MXX07 number was generated for the convenience of the bank to enable a combined statement. The presence of the MXX07 number at the top of combined account statements and the periodic issuance of separate account statements for the pledged accounts do not amount to evidence that MXX07 was its own separate account.

undisputed that the money in this purportedly new account came from accounts XX27, XX30, and XX49.  It therefore falls into the definition of collateral under the 2008 Security Agreement, which reads: "the following described property . . . and any additions, replacements, accessions, or substitutions thereof and all cash and non-cash proceeds and products thereof (collectively, 'Collateral')" and "[a]ll of the investment property, financial asserts, cash, equity interests, instruments, and/or general intangibles, which are held in or credited to an account (the 'Pledged Account') with Wachovia Bank . . . and the Pledged Account itself, described as followed: Account No. [XX]27, [XX]30, & [XX]49; and all rights to which the Debtor now or hereafter becomes entitled by reason of its interest in the previously described Collateral. . . ."  This definition explicitly includes the cash within the pledged accounts in addition to the pledged accounts themselves.  Therefore, it includes those cash assets even if transferred to a new account. It also includes additions, replacements, and substitutions of the listed collateral, such as the pledged accounts.

Plaintiff asserts that this definition of collateral conflicts with the 2008 Security Agreement's requirement that any waiver, amendment, or modification of the security agreement be in writing and signed by the Pearsons.  Plaintiff asserts that this renders the 2008 Security Agreement ambiguous, because it allows for additions and substitutions to the collateral but then requires modifications be in writing and signed.

"[C]ontract language is ambiguous where 'it is, in fact, reasonably or fairly susceptible to the different constructions being advocated by the parties.'"  *Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228, 1246 (11th Cir. 2002) (quoting *Royal Am. Realty, Inc. v. Bank of Palm Beach and Trust Co.*, 215 So.2d 336, 338 (Fla. 4th DCA 1968)).  In this case, the 2008 Security

Agreement is not fairly susceptible to different constructions with respect to the claims at issue. First, the cash in the pledged accounts is clearly collateral, even if moved to a consolidated account. Second, the definition of collateral is set in the contract to include substitutions of the original collateral. Therefore, the 2008 Security Agreement does not need to be "amended" or "modified" in order for cash from a pledged account or a substituted account to be included in its definition of collateral. Thus, its requirement for amendments and modifications to be incorporated in signed writings does not conflict or create an ambiguity with the definition of collateral. As discussed above, it is undisputed that Defendant Wachovia had a right to the collateral in the pledged accounts pursuant to the Security Agreements. Therefore, even if MXX07 were a separate account rather than a number used to generate a combined account statement, Defendant would be entitled to treat the assets transferred to MXX07 as collateral pursuant to the 2008 Security Agreement. *See Braun v. Intercontinental Bank*, 466 So.2d 1130, 1132 (Fla. 3d DCA 1985) (granting summary judgment for a bank defendant on a conversion claim by a bank customer, when the bank duly honored a demand for payment on a letter of credit and then immediately liquidated a certificate of deposit that the customer left as collateral).

**B.     Conversion**

"Under Florida law, conversion is 'an act of dominion wrongfully asserted over another's property inconsistent with his ownership of it.'" *Kee v. National Reserve Life Ins. Co.*, 918 F.2d 1538, 1541 (11th Cir. 1990) (quoting *Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc.*, 777 F.2d 1504, 1507 (11th Cir.1985)). "In order to establish a claim for conversion of money under Florida law, a plaintiff must demonstrate, by a preponderance of the evidence: (1) specific and identifiable money; (2) possession or an immediate right to possess that

money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for

return of the money and a refusal to do so." *United States v. Bailey*, 288 F. Supp. 2d 1261, 1264

(M.D. Fla. 2003). In this case, Defendant asserts that Plaintiff cannot show that it wrongfully

asserted dominion over Plaintiff's property, because the act of debiting the account was

authorized by the Security Agreements Plaintiff and her husband executed. Accordingly,

summary judgment on this claim is appropriate.

**C.     Civil Theft**

"[T]o state a claim for civil theft under Florida law, [Plaintiff] must allege an injury

resulting from a violation by [Defendant] of the criminal theft statute, Fla. Stat. § 812.014."

*United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009). Plaintiff must

present evidence that Defendant "(1) knowingly (2) obtained or used, or endeavored to obtain or

use, [Plaintiff's] property with (3) 'felonious intent' (4) either temporarily or permanently to (a)

deprive [Plaintiff] of [her] right to or a benefit from the property or (b) appropriate the property to

[Defendant's] own use or to the use of any person not entitled to the property." *Id*. (citing Fla.

Stat. §§ 772.11 (providing civil remedy for theft or exploitation), 812.014(1) (criminal theft

statute); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1326-27 (11th Cir. 2006)). "In order to

establish an action for civil theft, the claimant must prove the statutory elements of theft, as well

as criminal intent." *Gersh v. Cofman*, 769 So.2d 407, 409 (Fla. 4th DCA 2000); *accord Gasparini

v. Pordomingo*, 972 So.2d 1053, 1056 (Fla. 3d DCA 2008). Plaintiff cannot point to any material

facts establishing that Defendant had felonious or criminal intent in debiting the account. Plaintiff

has also failed to point to any material facts establishing that Defendant was not entitled to the

property. Accordingly, Defendant is entitled to summary judgment on this claim.

-11-

**D.      Unjust Enrichment and Constructive Trust**

The elements that must be proven under a theory of unjust enrichment are 1) a benefit conferred upon a defendant by the plaintiff, 2) the defendant's appreciation of the benefit, and 3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.  *Swindell v. Crowson*, 712 So.2d 1162, 1163 (Fla. 2d DCA 1998).  Under Florida law, the Court may impose a constructive trust where there is "clear and convincing proof of (1) a promise, express or implied, (2) transfer of the property and reliance thereon, (3) a confidential relationship, and (4) unjust enrichment." *Gersh v. Cofman*, 769 So.2d 407, 409 (Fla. 4th DCA 2000).  Therefore, Plaintiff's claim for the imposition of a constructive trust derives from and depends upon her unjust enrichment claim.

Defendant is entitled to summary judgment on Plaintiff's unjust enrichment claim because there is no evidence that Defendant retained the money at issue under circumstances that make it inequitable for Defendant to retain it.  At the time the debit occurred, Mr. Pearson had defaulted on a $4 million SBLC.  He and Plaintiff had secured that debt with the Wachovia Wealth investment accounts that they owned.  In response to Defendant's motion for summary judgment, and even in the sur-reply brief the Court permitted out of an abundance of caution, Plaintiff never pointed to any evidence that Wachovia's collection of the debt due and owing from Mr. Pearson was inequitable.  In order to deny Defendant's motion for summary judgment on unjust enrichment and for a constructive trust, there would have to be "evidence . . . that retention of any benefit by the defendant without compensation would be unjust." *Swindell*, 712 So.2d at 1163.  In

-12-

the absence of such evidence, the Court will grant summary judgment on Counts III and IV.[5]

Accordingly, after careful consideration, it is hereby:

**ORDERED AND ADJUDGED** that

1. Defendant Wachovia Bank, N.A.'s Motion for Summary Judgment **(D.E. No. 42)** is

GRANTED.

2. Final judgment shall be entered by separate order.

3. This case is CLOSED, and all pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 31st day of December, 2010.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Brown
All Counsel of Record

---

[5] Defendants also assert that the economic loss rule prohibits Plaintiff from bringing tort claims for conversion, civil theft, and unjust enrichment. Because the Court has granted summary judgment on other grounds, it is not necessary to discuss this claim in depth. However, the Court notes that "the economic loss rule provides that parties to a contract can only seek tort damages if conduct occurs that establishes a tort distinguishable from or independent of a breach of contract." *Royal Surplus Lines Ins. Co. v. Coachman Indus., Inc.*, 184 Fed. Appx. 894, 902 (11th Cir. 2006). The Florida Supreme Court has stated that "the economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action." *Indemnity Ins. Co. of N. America v. American Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004). In this case, there is no breach of contract claim. Furthermore, the facts alleged by Plaintiff cannot easily be construed to give rise to a breach of contract action, because Plaintiff has not alleged that Defendant breached the Security Agreements or any other contracts. Accordingly, it does not appear that the economic loss rule bars Plaintiff's claims.